1
2
3
4
5
6
7
8            UNITED STATES DISTRICT COURT

9           NORTHERN DISTRICT OF CALIFORNIA

10

11   RONALD BERNSTEIN, et al.,              No. C 05-01528 SBA (WDB)

                  Plaintiffs,
12
                                            OPINION AND ORDER
13                                          GRANTING PLAINTIFFS'
          v.                                MOTION TO COMPEL
14                                          DISCLOSURE OF INFORMATION
     THE TRAVELERS INSURANCE                REGARDING INSURANCE
15   COMPANY, et al.,                       RESERVES

16                Defendants.
                                       /
17

18

19        Plaintiffs are first party insureds and defendants are the insurance companies

20   that issued insurance policies to plaintiffs that covered certain property damage.   In

21   this action, plaintiffs (hereafter "Bernstein") contend that defendants (hereafter

22   "Travelers") acted in bad faith when they unjustifiably resisted claims and delayed

23   payments under the relevant policies and when they made a settlement offer to

24   plaintiffs (their insureds) that they allegedly knew fell well short of the amount to

25   which plaintiffs were entitled under the policies.  Travelers eventually paid the claims

26   (as determined by a panel of arbitrators) – but only, plaintiffs contend, after a studied

27   effort to escape what it knew it owed by adopting a strategy of resistance and delay

28

                                            1

that it hoped would induce plaintiffs essentially to give up and accept a settlement offer at a figure that was much lower than the amount Travelers knew it really owed.

### The Issue

The pending motion to compel, on which the court heard oral argument on August 16, 2006, requires us to address this issue: under the circumstances here presented, is Bernstein entitled to discover from Travelers the amounts that Travelers "reserved" at various junctures on plaintiff's claims, the internal notes and communications by Travelers' employees related to such reserves, and the criteria or considerations that Travelers instructed its employees to use when determining the size of reserves on claims of the kind Bernstein made to Travelers?

Travelers has not contended that the information and internal communications that are in issue here are protected by any privilege or by the work product doctrine. Instead, Travelers has based its refusal to produce this material solely on the argument that it is irrelevant.

Our first task, in addressing this dispute, is to determine whose law we are to apply? Do we draw the controlling principles from the Federal Rules of Civil Procedure or from substantive California law?

The answer is both.   It is in a dynamic between federal procedural law and California substantive law that we must find our answers.

### Considerations Rooted in Fed. R. Civ. P. 26(b)

Federal Rule of Civil Procedure 26(b) is the source of the generic conceptual standards that fix the outer relevance boundaries of discovery in all civil cases that are litigated in federal courts – regardless of the basis for subject matter jurisdiction. It is Rule 26(b) that supplies the directives that federal courts must follow when trying to determine how far beyond clearly admissible evidence parties may cast their

discovery nets.  It is to that Rule's guidance that federal courts are to turn when trying to decide how long and how indirect the inferential or sleuthing paths may be between the targets of discovery requests, on the one hand, and, on the other, matters obviously central to the parties' claims and defenses.

It is not immaterial to the issues we address here that in the year 2000 the judiciary and Congress made changes in the language of Rule 26(b) that clearly were intended to pull back the presumptive outer relevance-boundaries of civil discovery. The change that most obviously signaled this intent consisted of substituting the words "claim or defense" for the phrase "subject matter involved in the pending action" in the general description of the presumptively permissible scope of discovery.  Fed. R. Civ. P. 26(b).  The Advisory Committee Notes that accompanied these amendments report that the primary target of the changes was discovery that swept "far beyond the claims and defenses of the parties," discovery that imposed unjustifiable expenses and delays and that sometimes seemed designed not to fairly litigate the issues presented by the pleadings but to "develop new claims or defenses." Fed. R. Civ. Pro. 26(b) advisory committee's note to amendments effective December 1, 2000.   Stated more crudely, the primary purposes of the changes were to discourage lawyers from using discovery to 'fish' for new claims or defenses and/or to run up unjustifiable litigation bills.

Significantly, the discovery requests in issue here clearly are intended to illuminate the bad faith claim that is at the center of the case – and complying with them would impose little burden (monetary or otherwise) on Travelers.

It is important to emphasize that the amended Federal Rule expressly permits judges to restore the presumptive outer boundary of discovery to its former location ("subject matter") on a showing of good cause.   The Advisory Committee Notes indicate that the framers of the amended Rule anticipated that the discovery process would be largely self-executing within the new, somewhat narrower boundaries of

presumptive entitlement – but that discovery beyond those boundaries was by no means precluded.  Fed. R. Civ. Pro. 26(b) advisory committee's note to amendments effective December 1, 2000. Under the new scheme, if disagreements arose over discovery outside the presumptively accessible zone the courts would become involved and would make circumstance-specific determinations about whether the additional discovery was appropriate.  It is exactly that situation that has arisen here.

As we make our circumstance-specific determination in the case at bar we will heed the admonition in the Advisory Committee Note that the "good-cause standard warranting broader discovery is meant to be flexible." Id.

We acknowledge that, as a result of the amendments to Rule 26 in the year 2000, the presumptive scope of discovery is narrower under the Federal Rules  than it is under the California Code of Civil Procedure.  California's procedural rules continue to fix the presumptive outer relevance boundaries of civil discovery in essentially the same locations that they had been fixed by the Federal Rules of Civil Procedure before the latter were amended in 2000.   Absent objection and judicial intervention, this difference can be significant.  But the difference is appreciably less significant once judicial intervention has been triggered in a case in federal court because the amended federal rule permits judges in appropriate cases to restore the reach of discovery to its former federal scope – which was effectively coterminous with the scope of civil discovery under California law.

## Considerations Rooted in Substantive California Law

The points thus far made are interesting, but it is on other considerations that disposition of the pending motion primarily turns. The source of those other considerations is California substantive law.  This follows because the concept of "relevance" can take on meaning only when it is attached to something.   We must

4

ask, relevant to what?  And we must answer: to the parties' claims or defenses[1] (so sayeth the federal procedural rule).  The scope of relevance is rooted squarely in the substantive legal norms that the parties claims and defenses  bring into play – not in any procedural rule.

California law is the source of plaintiff's claim for tortious breach of contractual duties (bad faith).  So  California law identifies what kinds of things the plaintiffs must prove to prevail on their claim (essential elements) and what kinds of things the defendant can try to prove to defeat it.  In other words, California law identifies the targets of litigation inquiry.  Those targets, we must bear in mind, can be either primary or secondary, either elements of a claim or defense, or facts or circumstances that are not in themselves such elements, but that, if established, would make the existence or non-existence of an element more or less likely.  It is only when we have  identified  these  targets  that  we  can  reliably  work  toward  determining whether, to what extent, or how directly or reliably the information sought by the contested discovery probes might help the parties,[2] the court, and the jury resolve the issues raised by the Bernstein claim and by Travelers' defenses to it.

One    additional  prefatory  observation  is  in  order.   Federal  courts  are  in sensitive circumstances when they are called upon  to explicate and apply substantive state law.  It is especially important for federal courts to proceed with caution when wrestling with  ambiguous or uncertain state law, or when trying to determine how the courts of the state would resolve an open or close question of state law.  Federal courts should  not purport to resolve issues of state law unless it is necessary to do so — and a federal court that is addressing a non-dispositive pretrial dispute should be slow to conclude that it is necessary — at that stage — to resolve close or debatable

---

[1]Or, in appropriate cases, to the subject matter involved in the action.

[2] It is the parties themselves who resolve most civil cases – by settlement.  So one of the purposes of discovery is to provide the parties with the information that will enable them to assess their positions reliably and thus to feel the confidence necessary to make decisions about settlement.

issues about what the substance of state law is. We make these observations because the parties' discovery dispute implicates a potentially important question of substantive state law whose answer is not at all clear to us. Authority for either of two answers exists.   Under one of the quite possible answers, the discovery sought is much more clearly relevant.  At this pretrial stage, we are reluctant to try to resolve this question – in part because we want to be careful not to cut off plaintiffs' access to evidence that could have considerable probative value if the state law issue is resolved in one of the two clearly viable ways.  This inclination is reinforced by two considerations made relevant by the Federal Rules of Civil Procedure: (1) we can protect any commercial sensitivity that attaches to the kind of information at issue here by entering an appropriate protective order, and (2) ordering Travelers to produce the material in dispute will impose no significant burden.

We turn now to our central challenge: in the specific setting of this case, how do we determine (by what path of reasoning) whether the information that plaintiffs seek about Travelers' reserves is sufficiently likely to be sufficiently useful (directly or indirectly) to the court and the parties in resolving the issues raised by Bernstein's claim and by Travelers' defenses to warrant the conclusion that the information qualifies as "relevant" for discovery purposes?

Travelers points to five considerations to support its contention that information about its reserves on Bernstein's claim can shed little or no probative light on whether Travelers acted in bad faith: (1) California law clearly recognizes that setting a reserve is not – and cannot be construed as – an admission of liability on the claim; (2) the amount of the reserve at any given time is merely an educated guess about what the carrier might be required to pay if there is coverage for all the claims that are being made in connection with a particular event or circumstance; (3) especially when made early in the life of a sizeable or complex claim, the information base on which  reserves are estimated is quite likely to be far short of complete and

reliable; (4) reserves are typically adjusted  frequently (over the life of a substantial set of claims) as the parties develop more information, and refine both the claims and their analyses of the coverage and cost issues; and (5) regulations promulgated by the state fix criteria on which reserves are to be based – and those regulations require carriers to take into account broad-based actuarial experience.

These kinds of considerations have helped persuade a number of other courts to conclude, in the specific settings they faced, that the reserve amounts were irrelevant to the coverage or bad-faith disputes before them (some in third-party actions, and some in actions by insureds directly against their own insurers) and, therefore, were not discoverable.[3]  As we have tried to work our way through this dispute, however, we have concluded that these points have less persuasive  force than they appear to have at first blush and that, at least when assessed in light of substantive California insurance law, they are outweighed by competing considerations.

We begin our explanation of the analytical path we have followed by addressing the arguments Travelers advances to support its contention that the reserve information that Bernstein seeks is irrelevant.  First, we note that it does not follow from the fact that the act of setting a reserve is not an admission of liability that the amount of a reserve, or the reasoning pursuant to which the amount was fixed, could never be discoverable. Many facts that fall far short of admissions are discoverable. Indeed, matter need not even be admissible evidence to fall within the scope of discovery – even under the narrower reach of presumptive permissibility established by the amendment of Rule 26(b) in 2000. Under that Rule, the test is not admissibility, but whether there appears to be a sufficient connection between the

---

[3] *Cf.* <u>American Prot. Insur. Co. v. Helm Concentrates, Inc.</u>, 140 F.R.D. 448 (E.D. Cal. 1991); <u>Fid. & Deposit Co. of Maryland v. McCulloch</u>, 168 F.R.D. 516 (E.D. Penn. 1996); <u>Leksi v. Fed. Ins. Co.</u>, 129 F.R.D. 99 (D. N.J. 1989); <u>Independent Petrochemical Corp v. Aetna Cas. & Sur. Co.</u>, 117 F.R.D. 283 (D. D.C. 1986).

target of the discovery probe and the issues to be litigated to support a conclusion that there is a decent chance that the party propounding the discovery  would be able to use the information it uncovers either as evidence or to help find evidence.    Thus, the fact that setting a reserve is not an admission of liability means only that plaintiffs could not use evidence about the reserves to directly establish an element of their claim — but that fact is hardly grounds for concluding that this kind of information may never be discoverable.

Nor can we ascribe great significance (in resolving the issue before us) to  the fact that, at least generally, the setting of a reserve (at least in something  more than a nominal amount) may have more direct probative utility in third party actions than in first party cases.  Under California law, a carrier has a duty to defend whenever there is any potential for coverage under the policy it issued.  *See e.g*, <u>Standard Fire Ins. Co. v. Spectrum Community Ass'n</u>, 141 Cal. App. 4th 1117 (4thth Dist. 2006). Given that standard, and the regulatory requirement in California that carriers set reserves for any liability they may incur, it is arguable that the act of setting a reserve (at least in an amount that exceeds expenses the carrier is likely to incur in making and defending its decision not to fund the insured's defense) implies an acknowledgment that the insured "may" have some exposure in the underlying action. In other words, there is a closer apparent proximity between the amount of a reserve and the coverage issue in a third party action (alleging bad faith in declining to fund an insured's defense) than in a first party case.

While that apparent proximity may make the argument in favor of compelling disclosure of reserves more compelling in third party cases, it certainly does not preclude the possibility that reserves might be discoverable in some first party cases. Our task is not to identify circumstances in which the argument to compel disclosure might be stronger, but to determine whether disclosure is appropriate in the specific

circumstances presented by the case at bar.  In other words, the issue before us is absolute, not relative.

Nor can we be content to rest our disposition of this motion on the fact that the amount of a reserve is only an educated guess about the amount the carrier ultimately might be required to pay, or that in the early stages of processing claims the carrier's information base is likely to be incomplete and not fully reliable, or that it is common for carriers to adjust reserves on a given claim (at least if it is potentially sizeable) fairly frequently over its processing life. These are points that defense counsel might appropriately use in challenging an effort by Bernstein to use the reserve amounts to try to prove, directly, that the carrier felt that its policy covered certain claims, or that it knew it owed its insured more money than it was willing to admit at various junctures in the pre-litigation history of the dispute.  The fact that information might suffer from some probative infirmities for some  purposes, however, is  not a sufficient ground for concluding that it is not discoverable. In assessing the 'discovery relevance'[4] of the targeted information, we must consider all the litigation purposes for which plaintiffs might use it – as direct evidence on a disputed issue, as grounds for challenging or testing positions taken during the litigation by the defendants, or as means to help develop evidence that could be used, directly or circumstantially, to litigate more reliably the principal issues in the case.

Travelers' remaining argument in support of its position that information related to its reserves is irrelevant also does not reach far enough to close the discovery door.  Travelers correctly points out that in California the task of setting reserves is regulated by statute and by directives issued by the Department of Insurance – and that under the applicable regulations carriers must take into account

---

[4]  I have borrowed the phrase "discovery relevance" from the opinion of the California Court of Appeal in <u>Lipton v. Superior Court</u>, 48 Cal. App. 4th 1599, 1614 (2nd Dist. 1996) – but I do not mean to suggest that the presumptively appropriate 'relevance-scope' of discovery under Fed.R.Civ.P. 26(b), as amended in 2000, is as broad as it is under California procedural law.

their own loss/payout experience over time and broadly-based actuarial data. Travelers does not contend, however, that the reserves it sets in response to individual claims are determined only (or even primarily) by such generic considerations. Nor does Travelers suggest that circumstances quite specific to individual claims do not play a significant role when Travelers' adjusters decide what the amount of the reserves for given claims should be, or at which junctures and under which criteria those amounts should be changed. Significantly, it is just such claim-specific information that Bernstein seeks through the discovery probes that are in issue here.

In short, while the points Travelers has made clearly deserve to be given fair play in our disposition of this motion, they are not sufficient to foreclose a finding that the information plaintiffs seek is discoverable in the case at bar.

The single most important source of support for this conclusion is the opinion of the California Court of Appeal in <u>Lipton v. Superior Court</u>, 48 Cal. App. 4th 1599 (2nd Dist. 1996).[5] Authored by one of the leading authorities on California bad faith insurance law, Justice H. Walter Croskey, <u>Lipton</u> squarely rejects the conclusion that information related to the reserves a carrier designated on a particular claim could never be discoverable in a bad faith case. Refusing to adopt a *per se* rule of 'discovery irrelevance,' Justice Croskey and his colleagues affirmed that "[t]he evaluation of a case made by an insurer . . . is information which might well lead to discovery of evidence admissible on any number of issues which commonly are presented in bad faith actions." <u>Id</u>. at 1614.

<u>Lipton</u> is not controlling in our case – in part because it was decided before some of the more recent important pronouncements by California courts about the

---

[5] We note here that <u>American Protection Insurance Co. v. Helm</u>, 140 F.R.D. 448 (E.D. CA 1991), on which Travelers relies so substantially in opposing plaintiffs' motion to compel, was decided by a *federal* trial court some *five years before* the California Court of Appeal published its opinion in <u>Lipton</u>. Given these circumstances, we cannot be confident that the issues addressed in <u>Helm</u> would be decided the same way, or on the basis of the same analysis, if they were litigated again today in that court.

scope and character of the "genuine dispute" doctrine (which we explore at length, below), and in part because the outcome in <u>Lipton</u> is predicated in some measure on the scope of civil discovery as fixed by the California Code of Civil Procedure, a scope, as noted above, that at the presumptive level, at least, is considerably broader than the scope envisioned under the current version of the Federal Rules of Civil Procedure.

But <u>Lipton</u> clearly demonstrates that California courts will be open to arguments in bad faith cases about the relevance of evidence about reserves – and that in some circumstances those courts will conclude that such evidence is discoverable. En route to its holding, the justices who joined in the <u>Lipton</u> opinion noted that they were "unaware of any applicable privilege which might preclude discovery of [the carrier's] loss reserve information." <u>Id</u>. at 1610 n. 12. The justices also squarely rejected a policy argument that the carrier in that case advanced against permitting discovery of the reserves that are set on particular claims. Counsel for the carrier had argued that if insurance companies knew that their reserves would be discoverable, they would feel pressure either to artificially lower or raise the reserve amounts – depending on what inferences or admissions they most feared might be argued in litigation arising out of the particular file. Largely because of the strength of the disciplining power of the regulatory environment in which carriers operate in California, Justice Croskey and his colleagues were not persuaded that there was a sufficient risk that any such pressures would distort reserve figures to justify creating even a low-level presumption against discovery of loss reserve information.

Unpersuaded by such policy arguments, the <u>Lipton</u> court declared that loss reserve information "may or may not be relevant in a subsequent bad faith action, depending on the issues presented." <u>Id</u>. at 1614.   The Court proceeded to point out that "an argument can be made for the proposition that loss reserve information might

11

have *some* relevance to the question of whether . . . the insurer had conducted a proper investigation or given reasonable consideration to all of the factors involved in a specific case which might expose its insured to an excess verdict." Id. (emphasis in original).

Perhaps most instructive for present purposes, the Lipton court held that "the requested loss reserve information might reasonably lead to the discovery of evidence admissible with respect to one or more of the three issues relied upon by Lipton," (id. at 1616) those being "(1) [the carrier's] *state of mind* regarding its claims handling practices; (2) [the carrier's] *knowledge* that aggregate coverage versus singular coverage applied for the benefit of Lipton and his firm but that such *knowledge* was *concealed* from both; and (3) the degree to which [the carrier] *ignored its own counsel's advice* regarding Lipton's probable liability with over-limits exposure." Id. at 1608 n. 8. In these significant passages, the Lipton court recognized that at least in some settings a carrier's subjective state of mind, i.e., what it actually knew and thought, and what motives animated its conduct, could constitute critical areas of inquiry in bad faith cases, and thus could be fully fair game for discovery.

To address the "discovery relevance" question in the case at bar, we must focus on the kinds of information the contested probes seek, what the plaintiffs' claims are, and what defenses Travelers intends to assert.

As we have noted, the discovery probes in issue here would address the following three types of questions: what were the reserves at each juncture that Travelers changed them over the course of processing Bernstein's claims, what were the contemporaneous thoughts and communications by and between Travelers' employees (internal to the company) that related to setting the reserves, and, at the pertinent times, what were the criteria the company instructed its adjusters to use

when fixing reserves for claims of the kind plaintiffs made under the Travelers' policies.

What are the claims or theories of the case to which plaintiffs contend this discovery would be relevant?  Stripped to its essentials, plaintiffs' theory of 'bad faith'  has two principal (and related) dimensions: (1) in an attempt to avoid reimbursing its insured for all the losses covered by its policies, Travelers intentionally and unjustifiably delayed making payments to which it knew (or clearly should have known) Bernstein was entitled; and (2) understanding from the outset that the claims arising from the covered events in this case were likely to be large, Travelers self-consciously employed a strategy of making unjustifiable demands for proof of loss and of delaying payments to which entitlement (under normally followed standards) had been more than adequately established in order to create a level of frustration and anxiety in plaintiffs that would induce them to accept a low-ball settlement offer part-way through the claims period – an offer that Travelers (under plaintiffs' theory) knew at the time would deliver a much smaller total payment than plaintiffs were entitled to under their policies.[6]

Central to plaintiffs' theory of the case is that Travelers repeatedly and knowingly refused to release payments that it knew it owed on the claims, and that Travelers' business strategy over at least the first 20 months of the claims processing period was to make unjustifiable demands for proof of claims, to unjustifiably delay making payments, and then to pay less than it actually believed it owed, all in order to soften Bernstein up for a settlement offer that Travelers knew was appreciably smaller than the real value of plaintiffs' claims.  Critical to this theory of the case is a posited self-conscious disconnect (a large, unbridgeable gap) between, on the one

---

[6]  See, e.g., plaintiffs' "Memorandum in Support of Motion to Compel Disclosure of Reserve Information," filed June 20, 2006, at pages 1-2 ("Plaintiffs allege that the various disputes raised by Travelers in the interim were essentially pretenses aimed at avoiding payments and forcing plaintiffs to accept a lowball settlement offer.")

hand, what Travelers  was communicating to, demanding of, and paying its insured and, on the other, what Travelers actually thought it owed and would owe under the claims. Under this theory, what Travelers' "internal assessment of the subject claim"[7] actually was at various junctures is the critical factual issue in the litigation.

Plaintiffs assert that discovery of the reserves that Travelers set aside, and of internal documents, comments and communications related to those reserves, will enable plaintiffs to uncover and prove what Travelers' "internal assessments" really were – and thus to demonstrate that there were big, inexplicable differences between what Travelers communicated to and demanded of plaintiffs and what Travelers really understood about both coverage and valuation issues.  Plaintiffs' counsel intends  to use the data about reserves and the related documents to depose Travelers' witnesses.  During these depositions, counsel will use this discovered material to explore how (by what reasoning) Travelers' adjusters arrived at the reserve figures they selected and what considerations informed any accompanying comments or related communications.  To conduct such an examination effectively, counsel for plaintiffs must know what the reserve figures were. It is only by asking Travelers to explain how, specifically, it arrived at each reserve amount that plaintiffs' counsel can  effectively explore the reasoning Travelers used — and thus try to expose  discrepancies between Travelers' internal assessments and its external communications and conduct.   Plaintiffs' counsel also intends to cross-examine Travelers' witnesses about how closely they followed established company guidelines or criteria for setting reserves for claims of the kind involved here – and to ask them to explain any apparent differences between those criteria and the bases for the reserve decisions that were made on Bernstein's claims.

Through these intended uses, plaintiffs may well be able to deploy the information they seek to discipline the giving of testimony during the depositions

---

[7] Plaintiffs' "Memorandum in Support of Motion to Compel," June 20, 2006, at 3.

(and at trial) and to probe the accuracy and truthfulness of factual averments by Travelers on issues that are central to plaintiffs' theory of the case. Without the materials sought through this discovery, plaintiffs and the court would be more dependent on oral testimony from Travelers' agents about what they really thought about the claims as they were being processed – and thus more vulnerable to good faith errors of memory or to deception.

The court is not aware of possible alternative sources of this information – or of any other information that might serve as well these potentially important purposes (disciplining oral testimony and equipping counsel and witnesses to explore much more reliably the adjusters' reasoning – reasoning that was undertaken three and four years ago). For these reasons, the court is satisfied that the discovery sought by plaintiffs is 'relevant' (meaning that it falls within even the narrower, presumptively accessible zone fixed by the amendments to Rule 26(b) that became effective in December of 2000).

We would be appreciably more cautious about ruling in favor of the discovery in issue here (because it is controversial and not transparently central to the litigation) if plaintiffs' theory of the case seemed to lack any real prospect of viability as a matter either of evidence or of law.

We have too little information at this juncture in the pretrial period to assess with confidence the likelihood that plaintiffs will be able to muster sufficient evidence to support the findings of fact that their theory requires. At this juncture all we can tell, from the major undisputed facts, is that there may be evidentiary viability in plaintiffs' bad faith claim. There were a great many disputes between Travelers and Bernstein about what kinds of losses were covered, how much money was owed on different components of the claim, and what kinds of proof should have been sufficient to support payments. It took years and, finally, a formal arbitration award to bring the claim processing to a close. Under the arbitrators' award, Travelers

released $224,000 more than it had paid before the award was made – some $177,000 of which "reflected losses for which Travelers had previously questioned or denied coverage."   Declaration of David Goble in Opposition to Plaintiffs' Motion to Compel, filed July 26, 2006, at  4.  That $224,000 represented 37% of the total amount Travelers ended up paying on Bernstein's claims. Moreover, in early February of 2003, when Travelers had paid a little more than $176,000 on the claim, Travelers' representatives made an offer to settle the entire matter for an additional $250,000.  Had Bernstein accepted that offer, Travelers would have paid $426,000 on the claim instead of the $602,000 it ended up paying after the arbitration (thus saving about 30% of what it ultimately agreed to pay).

While these  skeletal facts obviously fall far short of the evidentiary support that would be necessary to sustain plaintiffs' claim of bad faith, they form an outline of events that (with some transaction-specific supplementation) justify further pretrial inquiry.   Thus, we cannot prohibit this reserves discovery on the ground that the factual contentions to which it would relate are supported by nothing but plaintiffs' speculation.

Our inquiry, however, is not at an end.  We also must be satisfied that there is meaningful prospect that, under California law, the factual theory advanced by plaintiffs would be legally viable.  Is there a real possibility that proving their core factual allegations about Travelers' state of mind and purposes would entitle plaintiffs, under California law, to recover on their bad faith claim?  At first blush, this would appear to be a self-answering question, but we have learned that blushes can fade.

The principal source of our uncertainty arises from what has come to be styled "the genuine [or legitimate] dispute doctrine." Century Sur. Co. v. Polisso, 139 Cal. App. 4th 922, 948- 949 (3rd Dist. 2006). That doctrine, as articulated  at a general level, "holds that an insurer does not act in bad faith when it mistakenly withholds

16

policy benefits, if the mistake is reasonable or is based on a legitimate dispute as to the insurer's liability." Id. at 949, *citing* Chateau Chamberay Homeowners Ass'n v. Associated Intern. Ins. Co., 90 Cal. App. 4th 335 (2nd Dist. 2001).   When applicable, this doctrine can be used by a carrier to make its subjective state of mind, e.g., the motives and the actual understandings of its adjusters, irrelevant. CalFarm Ins. Co. v. Krusiewicz, 131 Cal. App. 4th 273, 287 (4th Dist. 2005) *citing* Morris v. Paul Revere Life Ins. Co., 109 Cal. App. 4th 966, 973-974 (4th Dist. 2003). This follows because the standard for determining whether a dispute is "genuine" under this doctrine is entirely objective.  Disposition turns on whether the insurer can establish that, at the time it disputed the claim, and given what it knew or should have known, a carrier, reasoning objectively, could rationally have taken the positions on the issues that the defendant took.  CalFarm, 131 Cal. App. 4th at 286 *citing*  Chateau Chamberay, 90 Cal. App. 4th at 346-347.   Could rational minds, working objectively, come to competing conclusions about whether the disputed claims were payable under the policy?  Did the carrier take one of the positions that was rationally accessible by objective reasoning?  If the answers to these questions are 'yes,' and if the genuine dispute doctrine applies, the "subjective intent" of the carriers' decision-makers becomes irrelevant. CalFarm, 131 Cal. App. 4th  at 287, *citing* Morris, 109 Cal. App. 4th at 973-974.

Travelers has advised the court that it intends to invoke the "genuine dispute" doctrine in this litigation in relation to many of the disputes it had with Bernstein. Travelers contends, further, that most of the subject disputes (at least as measured by monetary value) were over 'coverage' issues – a contention of some potential significance because at least one California court has suggested that the "genuine dispute" doctrine "has been applied primarily in first-party coverage cases, usually involving disputes over policy language or its application."  Polisso, 139 Cal. App. 4th at 951 (citing numerous opinions by California courts).

This suggestion raises the first of several questions about what role the "genuine dispute doctrine" should play in our ruling on Bernstein's  motion to compel.  When does this doctrine apply?   Phrased more to the point, in what range of circumstances would California courts hold that this doctrine operates to make questions about a carrier's subjective (actual) state of mind irrelevant?  The answer to this question is not entirely clear.

The circumstance in which California courts are most likely to recognize this doctrine arises when the dispute between the carrier and its insured turns entirely on the meaning that is to be ascribed to words in the subject insurance policy. Chateau Chamberay, 90 Cal. App. 4th at 347. If reasonable minds could have differed (at the pertinent juncture) about that meaning, and if the carrier's actions were consistent with one of the reasonably accessible interpretations, California courts apparently would shield the carrier from liability for bad faith in denying coverage (even if the carrier ultimately was found liable on a breach on contract theory).  Id.

More  recently, California courts have applied the genuine dispute  doctrine in some circumstances when the issue about which the carrier and its insured have disagreed is essentially factual, e.g., the monetary value of the damage to protected property that was caused in an admittedly covered occurrence. See CalFarm, 131 Cal. App. 4th at 286; see also Polisso, 139 Cal. App. 4th at 949; Chateau Chamberay, 90 Cal. App. 4th at 346; Fraley v. Allstate Ins. Co., 81 Cal. App. 4th 1282, 1293 (4th Dist. 2000).  In the absence of evidence that casts a suspicious shadow over the integrity or completeness of the process by which relevant information was acquired or generated, see Guebara v. Allstate Ins. Co., 237 F. 3d 987 (9th Cir. 2001), if the facts about what the carrier knew at the time are not genuinely disputable, California courts apparently would protect the carrier from a bad faith claim if it could show that objective and reasonable inferencing  from the known facts could support the position the carrier took.

The circumstances described in the two preceding paragraphs are (at a conceptual level) relatively simple.  As the circumstances and claims of a given case become more complicated, however, the applicability and role of the genuine dispute doctrine becomes less clear.  When an insured bases claims for bad faith on several different claims decisions or courses of conduct, a carrier should not be permitted to defeat all of them by showing that there was a genuine dispute as to just one.  *See* Marc S. Mayerson, "First Party" Insurance Bad Faith Claims:  Mooring Procedure to Substance, 38 Tort Trial & Ins. Prac. L.J. 861, 876-878 (Spring 2003).  And California courts have not made it clear what play should be given (if any) to the genuine dispute  doctrine when the bases for the bad faith claim focus  primarily on an overall assessment of how a multi-faceted claim was processed and the manner in which the carrier purported to meet its duty to its insured to (1) investigate the pertinent matters thoroughly, impartially, and promptly, (2) to communicate honestly and responsibly with the insured as the claims are processed, (3) to make timely decisions about the claims, and (4) to explain clearly and forthrightly the bases on which the carrier actually premised its  decisions and its settlement offers.  *See* id.

We can illuminate some of the sources of our uncertainty about the role of the genuine dispute doctrine by focusing on a bad faith action that is predicated on an alleged failure by the carrier to properly investigate a claim.  As one California court has explained, "[t]o protect [an insured's] interests it is essential that an insurer fully inquire into *possible bases that might support the insured's claim*.  Although we recognize that distinguishing fraudulent from legitimate claims may occasionally be difficult for insurers, . . . an insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial." Egan v. Mutual of Omaha Ins. Co., 24 Cal. 3d 809, 819 (1979) (emphasis added).  In a similar vein, another California court has emphasized that "an insurance company has a duty to diligently search for evidence which supports its insured's

claim.  If it *seeks to discover only the evidence that defeats the claim* it holds it own interest above that of the insured."  <u>Mariscal v. Old Republic Life Ins. Co.</u>, 42 Cal. App. 4th 1617, 1620 (2nd Dist. 1996) (emphasis added).

As these articulations of a carrier's duty indicate, a carrier can be found liable on a bad faith theory for conducting an investigation that is unjustifiably superficial or perfunctory *or that looks only in one self-serving direction* for evidence about the source, nature, or extent of the claimed losses. It is at least arguable that by recognizing a theory of liability based on whether a carrier *"seeks* to discover only the evidence that defeats the claim," *see* <u>id.</u>, California authorities are acknowledging that, when a bad faith claim is based on an alleged failure to conduct a proper investigation, one of the ultimate targets of inquiry may be *why* the carrier acted as it did, i.e., what *purposes* gave direction to the way it sought information and where it decided to look for evidence.  Determining reliably whether a carrier *sought* to discover only the evidence that defeats the claim is, predictably, a difficult and complex task.  We suspect that, at least when not all the pertinent facts are indisputable, California courts would recognize as relevant to making that determination an exploration (through discovery, initially) not only of what the carrier investigated, but also of what the reasoning was that the carrier actually used when it decided to search in some places and not others, or for some kinds of information and not for others.

When the inquiry is to focus on *process,* on both what the carrier's process consisted of and whether it was distorted by an over-balance of self-interest, (<u>Egan</u>, 24 Cal. 3d at 818-819), the play that California courts would give to the "genuine dispute" doctrine is, at a minimum, not obvious.  While one can readily imagine "genuine disputes" about what words mean, or about how far particular provisions of an insurance policy reach, or about which items of personal property were actually incinerated in a fire, it is difficult to understand how to frame a "genuine dispute"

argument when the theory of the plaintiff's case turns on a contention that an unlawful selfish bias was systemically at work in the carrier's investigation. While a carrier and its insured could have diverging views about the objectivity or impartiality of an investigation, it is not obvious that the courts could or should try to determine (as a matter of law – before permitting the insured to explore what the carrier actually thought as it processed the claim) whether it would have been reasonable for a comparably situated, hypothetical carrier to conclude that its investigatory process was properly animated and was as balanced and objective as the law requires. Given the apparent strain in the fit, we question whether California courts would agree to distend the "genuine dispute" doctrine into these kinds of bad faith cases.[8]

This is not to suggest, of course, that there is no room for motions for summary judgment in cases predicated on an allegation of biased investigation.   There may well be instances where, after being permitted to engage in appropriate discovery, a plaintiff simply fails to develop enough evidence of bias to get to a jury.  But we presume that California courts would appreciate the considerable difference between (1) giving a defendant an opportunity (through a motion for summary judgment) to try to show that the plaintiff, after discovery, simply had not adduced sufficient evidence (direct or circumstantial) to permit a rational trier of fact to conclude that the insurer's process was infected by unlawful bias; and (2) permitting a defendant, simply by invoking the genuine dispute doctrine, to block all discovery access to an entire arena of evidence that is likely to shed light on both the character and purposes

---

[8]  If, after a fair opportunity to conduct discovery, a plaintiff can identify no circumstantial or direct evidence that tends to suggest bias or unjustifiable resistance to making payments in reasonable amounts and within reasonable times, a California court might feel positioned to grant a carrier's motion for summary judgment on a bad faith claim that was based on an allegation that excessive self-interest distorted the way the carrier investigated the matter.   The granting of such a motion, however, would be the product of a plaintiff's failure, after being given fair opportunity, to locate evidence that tended to support its theory of the case; it would not be the product of pre-discovery application of the genuine dispute doctrine.

of the carrier's claims handling process.   We presume, in other words, that California courts will be careful to distinguish between *sufficiency* of proof and *targets* of proof. *See* Mayerson, 38 Tort Trial & Ins. Prac. L.J. at 876-878.

This view is reinforced by observations that a California trial court made while explaining its denial of a carrier's motion for summary judgment:

> Where there is a factual dispute as to the sincerity and genuineness of the purported bases for denying coverage and the reasonableness of the insurer's overall conduct in wrongly denying the claim, "an insurer's bad faith is ordinarily a question of fact to be determined by a jury considering the evidence of motive, intent and state of mind."

Montrose Chem. Corp. of Cal. v. Canadian Universal Ins. Co., C 594 148 (Cal. Super. Ct. Nov. 29, 2001), *quoted in* Mayerson, 38 Tort Trial & Ins. Prac. L.J. at 876-877.

Significantly, the quoted material in this passage appears in one of the most frequently cited recent opinions by a California Court of Appeal that addresses the play between bad faith claims and the genuine dispute doctrine.   *See* Chateau Chamberay, 90 Cal. App. 4th at 347.   While confirming  that that doctrine can be applied in some circumstances when the dispute between the carrier and its insured is "factual" in nature, and while acknowledging that courts may grant motions for summary judgment on this ground when no material facts are genuinely disputed, the Chateau court also emphasized that, at its conceptual heart, a claim of bad faith accuses a carrier of conduct that is not merely unreasonable in the traditional tort sense, i.e., that is not merely negligent, but that is more culpable, that is separated from norms of understandable behavior by an appreciably wider margin.   Quoting from Careau & Co. v. Security Pacific Business Credit, Inc., 222 Cal. App. 3d 1371, 1395 (2nd Dist. 1990), the Chateau court reminds us that in order to prevail on a claim that sounds in bad faith, a claimant:

> [M]ust show that the conduct of the defendant . . . demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence, but rather by a

1
2
3

> *conscious and deliberate act*, which *unfairly* frustrates the agreed common purposes and disappoints the reasonable expectations of the other party . . . . Just what conduct will meet these criteria must be determined on a case by case basis.

4    Chateau Chamberay, 90 Cal. App. 4th at 346.

5           The Chateau court also endorsed an observation by a 9th Circuit panel in

6    Guebara v. Allstate Ins. Co., 237 F.3d 987, 996 (9th Cir. 2001), which cautioned that

7    an expert's opinion that a carrier's conduct was reasonable would not always

8    "insulate insurers from bad faith claims based on biased investigations."  Chateau

9    Chamberay, 90 Cal. App. 4th at 348.  The Guebara court proceeded to point out that

10   no such insulation should attach, as a matter of law, when there was a triable

11   contention that the carrier had misrepresented the nature of the investigatory

12   proceedings, or lied to the insured, or "dishonestly selected its experts" [anticipating

13   that their opinions would not be objective], or failed to conduct a thorough

14   investigation. Guebara, 237 F.3d. at 995-996.  By endorsing these views, and

15   emphasizing that this list is not exhaustive, the Chateau court reminded us, as its

16   author has written elsewhere, that, as a general proposition, the covenant of good

17   faith and fair dealing "has both a subjective and an objective aspect – subjective good

18   faith and objective fair dealing: '[a] party violates the covenant *if it subjectively lacks*

19   *belief in the validity of its act* or if its conduct is objectively unreasonable."  Hon. H.

20   Walter Croskey & Hon. Rex Heeseman, California Practice Guide: Insurance

21   Litigation Ch. 12A-C (2006), *citing* Carma Developers (Calif.), Inc. v. Marathon

22   Develop. Calif., Inc., 2 Cal. 4th 342, 372 (1992) (emphasis in original).

23           These reminders and cautions teach us that, under California law, there are

24   limits to  the applicability of the genuine dispute doctrine – and that courts should

25   take care not to extend the use of that doctrine so far that it obliterates across the

26   board the fundamental precept that the requirement of  'good faith and fair dealing'

27   imposes both a subjective and an objective duty.  In other words, despite (or maybe

28

23

1   even especially in view of) the creep of the genuine dispute doctrine, California

2   courts should not forget that "an insurer's bad faith is ordinarily a question of fact to

3   be determined by the jury by considering the evidence of motive, intent and state of

4   mind." <u>Chateau Chamberay</u>, 90 Cal. App. 4th at 350.

5       As this exploration of California law indicates, it is simply not clear whether,

6   or to what extent, California law would permit Travelers, in response to the specific

7   kinds of allegations that Bernstein makes in this case, to invoke the "genuine dispute"

8   doctrine to stave off inquiry at trial into what Travelers' state of mind was over the

9   period that Bernstein's claim was being processed, e.g., inquiries into what Travelers'

10  reasoning actually was about the disputed claims and what motives animated

11  Travelers' communications with its insured and the positions it took on the disputed

12  matters.   There certainly is a possibility, in the circumstances presented by the

13  pleadings in this case, that California courts would not permit Travelers to use the

14  genuine dispute doctrine to avoid any exploration of its state of mind.  We therefore

15  conclude that it would be improper at this pretrial stage in the litigation, before any

16  motions purporting to invoke the genuine dispute doctrine even have been filed,  to

17  refuse to permit Bernstein to conduct relatively compact discovery that is reasonably

18  calculated to shed probative light on what Travelers actually thought about the merits

19  and values of the various components of Bernstein's claim.

20      This conclusion is bolstered by several additional considerations.  First, even

21  if California law would permit Travelers to invoke the genuine dispute doctrine with

22  respect to some of Bernstein's claims, we certainly cannot *assume*, at this stage in the

23  evidentiary development of the case, that Travelers would persuade the court to grant

24  summary judgment on some of the issues on this theory.   It would be even less

25  appropriate for us to assume that plaintiffs would prevail on a motion for summary

26  judgment that sought to dispose of Bernstein's bad faith claim in its entirety.  To

27  succeed on a motion of that broad reach, plaintiffs would need to demonstrate that

28

24

reasonable minds could only reach one conclusion from all the evidence and circumstances, that conclusion being that the positions Travelers took on all of the many disputed components of the Bernstein claim were reasonable and that, viewed in its entirety, a self-interested bias did not distort the way Travelers processed or investigated the claim. It would be transparently improper for this court, in ruling on a discovery dispute, to pre-judge such an important and complicated issue – an issue that the California courts repeatedly admonish us must be addressed on a case by case basis and only after developing a reliable understanding of the specific circumstances that obtained at the time the carrier took the positions it now contends were reasonable.

Moreover, if the district court later in these proceedings were to decide that Travelers could invoke the genuine dispute doctrine, but then Travelers failed to make the necessary showing, Bernstein clearly would be entitled at that juncture to explore the matters to which this disputed discovery is relevant:  Travelers' internal analyses and valuations, and the considerations by which they were affected.  It would contravene judicial efficiency and it would delay, unjustifiably, reaching closure in this case (by adjudication or settlement) not to permit this limited and focused discovery to proceed at this time.

Additional considerations that support this conclusion are rooted in Bernstein's allegation that Travelers resisted and delayed payments in a calculated effort to induce Bernstein to accept a low-ball settlement offer that Travelers planned to make part-way through the claims processing period.  Under this theory, Travelers well knew that the remaining components of the Bernstein claim were worth much more than the $250,000 Travelers offered in early February of 2003 to settle the entire business.  As noted above, Bernstein can point at this stage in the pretrial development of this litigation to some circumstantial evidence that could lend support to this contention – so it appears to be more than a naked conclusory allegation.

That being the situation, Bernstein could advance an additional argument for permitting the discovery. That argument is based on California Civil Jury Instruction 12.94. Cal. Civ. Jury Instruction, Baji (April 2006). This instruction begins by pointing out that "[e]vidence that the insurer's handling of the insured's claim was or was not in general compliance with applicable statutory guidelines is relevant [as one factor, not necessarily dispositive] in determining whether the insurer's conduct was reasonable." Id. This Jury Instruction proceeds to set forth 15 pertinent statutory guidelines – each of which identifies conduct that carriers are required to avoid. Four (perhaps more) of these prohibitions might be implicated under Bernstein's contention that Travelers knew that its $250,000 settlement offer was unjustifiably low. These are the prohibitions against (1) "[n]ot attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear"; (2) "[c]ompelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by the insureds, when the insureds have made claims for amounts reasonably similar to the amounts ultimately recovered"; (3) "[a]ttempting to settle a claim by an insured for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application"; and (4) "[f]ailing to provide promptly a reasonable explanation of the basis relied on in the insurance policy, in relation to the facts or applicable law, for the denial of a claim or for the offer of a compromise settlement." Id.

We do not know, at this stage of the proceedings, whether the discovery process will yield sufficient evidence to permit a rational trier of fact to conclude that Travelers' conduct while processing Bernstein's claim breached any of these guidelines. Nor can we be certain whether, or to what extent, California courts would permit Travelers to invoke the genuine dispute doctrine in defending itself

against contentions that it breached any of these guidelines. It is at least arguable, however, that some of the potentially relevant guidelines speak, among other things, to a carrier's state of mind when it makes a settlement offer. For example, under one of the guidelines quoted above, a carrier has a duty to "provide promptly a reasonable explanation of *the basis relied on* in the insurance policy, in relation to the facts or applicable law . . . for the offer of a compromise settlement." Id. (emphasis added). The duty described in this guideline may well have both objective and subjective components. While the guideline requires the carrier's explanation to be "reasonable," it also suggests that what the carrier should be required to explain reasonably is "the basis" on which it actually relies when it frames its offer. Thus, California courts might hold that a carrier could violate this guideline by providing an explanation of its settlement offer that it knew was at odds with its actual assessment of the value of the case.

Given these possibilities, it simply is not clear that, in the kind of circumstances alleged by Bernstein, California courts would hold that evidence about what the carrier actually knew at the time it made an "offer of a compromise settlement," and what it actually thought about the value of and the evidence supporting its insured's claims at that time, was irrelevant to determining whether the carrier acted "unreasonably or without  proper cause," i.e., whether, in the circumstances,  making the settlement offer of the size Travelers made constituted "a conscious and deliberate act" that, if successful, would have unfairly frustrated the agreed common purposes of the insurance contract. Careau, 222 Cal. App. 3d at 1395; *see also* Chateau Chamberay, 90 Cal. App. 4th at 346.

For all the reasons set forth in the preceding pages, we **hold** that, under Federal Rule of Civil Procedure 26(b) and the applicable substantive California law, the **discovery** that Bernstein seeks to compel Travelers to provide through this motion **is relevant**.

1       There being no other asserted grounds for denying the motion, it is hereby

2   GRANTED – on the condition that the information that Travelers produces (in

3   documentary or testimonial form) about the loss reserves on the subject claims and

4   the internal criteria, analyses, comments, conclusions,  and communications related

5   thereto are subject to a PROTECTIVE ORDER (hereby entered) prohibiting plaintiffs

6   or their counsel from using the information for any purpose other than this litigation

7   and from disclosing it to anyone who is not an officer or agent of this court or a party

8   to this action (or such party's agent).

9

10   IT IS SO ORDERED.

11   Dated: August 28, 2006.

                                            */s/ Wayne D. Brazil*

12                                              _____

13                                              WAYNE D. BRAZIL
                                           United States Magistrate Judge

14   Copies to:
        All parties,

15           WDB, Stats

16

17

18

19

20

21

22

23

24

25

26

27

28